at all. So, as we had discussed when we were here before, we're just going to take it from the top, but of course, you can also expect that the prior record exists, and so that'll be part of what we'll be working off as we endeavor to decide the case, and you might hear some questions about that today. Mr. Overstreet. Thank you, Your Honor, and good morning. David Overstreet for Wayne Land and Mineral Group, and I'm joined today by my co-consultant, Jeff Filardi, and by Mr. Matt Haberstick, who is Counsel for the elected officials at McKay. I'd like to focus my remarks this morning on what I think are the issues inherent in the questions that this Court asked last time. We were together, and I want to talk in particular about ambiguity as it relates to the definition of project in the compact, and I want to be careful here because I think whether we apply contract principles or statutory construction principles, the outcome is, in fact, the same. Well, it wouldn't be the same if we were dealing with an ambiguity. I mean, that was the purpose for which I was pressing you before, Mr. Overstreet, that if we're dealing with contract principles and we have an ambiguity, that means we can look beyond the four corners of the document and do some questioning about whether there are other resources that would enlighten, and that's a fact-finding enterprise, isn't it? It would be if we were to conclude that there's an ambiguity, a relevant ambiguity, and I would draw the Court's attention to its decision in Baldwin v. University of Pittsburgh Medical Center where in this Court performed the first step, the legal question of whether in fact a document, in this case a contract, is ambiguous, and the Court instructed that we're going to look in addition to the words of the document, we're going to look at its structure, we're going to look at the bargaining history, and we're going to look at the conduct of the document, whether there's an ambiguity. And I would submit, therefore, sir, when we focus on the purposelessness of the definition, and we zero in on the word for, and we apply those tools, I would submit there is no ambiguity as to that part of the definition of the project. But it hinges on your assertion that it's unambiguous, and your assertion that we can look at these, we can take these tools, and on the record we've got, we can make a decision about what the word project means by digging into it. That's the premise of the argument, right? The premise of the argument, and I think in answering your question, I'm speaking now of the fore language and the purposelessness of the definition. I would submit that there are, there's the storage tank problem, and I'll get to that in Judge Hartiman's question about storage tanks, but as to the purposelessness of it, we don't think there is an ambiguity if you apply those contract interpretation principles to the document as it exists today, and to the record as submitted to the court. All right, well, why don't you, given the limited amount of time, why don't you get to Judge Hartiman's earlier question, because you said in your reply brief on page four, and again on page seven, I thought that, and I'll actually quote you from page four, the commission implies that it exercised project review jurisdiction over the power plants themselves, but what the commission actually did, and has historically done, was to review separate facilities associated with the power plants, which in every case were water resource development or management projects, close quote. And, you know, Judge Hartiman's here with us virtually. He can speak for himself, but I understood the import of his questions to be, look, if that's been your position, why are you taking this all or nothing position here? Why isn't it the case that the storage facility on storage, the water storage tank could be a project, and yet your well pad wouldn't be? And I think I can answer it this way, Your Honor. With respect to the question actually before the court, which is simply whether in asserting that well pads and gas wells, no details, categorically are projects, we think that that assertion can be set aside based on the definition of project and the purpose in this element as we look at it. How can we set it aside? How can we, you acknowledged under questioning last time that what you're purporting or planning to do has to involve some storage tank. At least I thought that. Maybe I was wrong about that. I thought there was a concession that we're going to have to do something with the water that's generated. There's going to have to be some kind of retention facility. Okay. So if that's necessarily part and parcel of what you're doing, then I'm getting some cognitive dissonance here, because I read your brief and you seem to say, well, look, when it came to power plants and things like that, yeah, there were some things that were facilities and regulable by the commission and other parts that weren't, and yet you come before us and say, no, it's all or nothing. So which is it and how do you square whichever piece you're taking by the other side of the argument you've been making? So this is the storage tank problem. This is the bucket problem. So it's like Google Maps. If you really want to keep zeroing in, you can get down to a purpose of the element. You can get down to a bucket and you can say, well, look, the bucket is for the purpose of managing water. Therefore, it meets that definition of element. My point, Your Honor, is this court doesn't need to get into that fine parsing. We don't need advisory opinions as to whether buckets and storage tanks are projects, because the only thing the commission has asserted here, the only question we need to read on is whether well pads and wells, that's it. A category of projects. We say that the well pad is not a project, and you build the well pad, and then you build a storage tank as required by PA code 78A.57A, and the purpose of that tank is to collect the brine and other fluids produced during operation of the well, the commission has a right to regulate that tank at that time, does it not? I would say we don't have to answer that question, because if the commission makes that assertion, we'll address it. And this question is, how can you ask us to split that that way? I mean, you say, only think about well pad, only, only think about well pad, but in the real world, there's no such thing as a well pad without some facility to handle the wastewater associated with the fracking. How can it be the case that in looking at this question, we could ignore what it sounds like is conceded must be a piece of any well pad project? There's got to be some way to deal with the wastewater. Because that question is not before the court. How can it not be before us if it's impossible for you to actually, or anybody to actually have a functioning well pad? Are you saying that we should, talking about advisory opinion, are you looking for an opinion that says you can build something that's of no use to anybody going ahead, but if you actually wanted to do something meaningful, that is, have a functioning well, then you would be regulable? I think we have to deal with what the commission has actually asserted and what we need relief from. The only thing we need relief from from this court is the assertion that well pads and wells categorically, without detail, without further information, are projects, because that's the premise upon which the moratorium is built. We then go to the state, and we make the application. If the commission then puts its hands up and says, oh, well, we remember they're buckets of projects, let it do that. I would suggest that would create a horrible legal protection problem, but they haven't done that. This court doesn't need to get into those in little high doses. Is it a ten-gallon bucket? Is it a hundred-gallon? Is it a million-gallon bucket? We still have to figure out where the source of the water is and where it's going to go afterwards, even as you have a storage tank. Is that part of the utilization? That is, again, a question that's not before this court, because the only thing we need relief from is the categorical assertion that well pads and wells are projects. That's all we need. That's our whole entire claim. And whether the commission will then assert that this water purveyor should have had a license or this wastewater treatment plant down the river should have wasn't a project, that is not a question for this court. We could spend a decade parsing hypotheticals. It's not a hypothetical, Mr. Oresti. I do not understand about your claim it's a hypothetical. And correct me if I'm misunderstanding this. It's my understanding that under Pennsylvania law, you have to do something with the water after the fracking occurs, correct? That's absolutely correct, Your Honor. And that's something that has to be done with the water is you either have to get a discharge permit or put up storage tanks. Your complaint, as I read it, specifically disclaimed any intent to discharge the water. So by process of elimination, you are now required to put up storage tanks. Is that not correct? Well, maybe. There are a lot of options within that. You can chop it off as it's produced. There are a lot of new ways you can manage produced water before that. But the point is, unless and until the commission asserts jurisdiction over those activities, this court doesn't need to rule whether those activities are projects. Those questions are simply not before this court. Because there are thousands of ways to design these well pads with all sorts of different water resources management tools from five-gallon buckets to a thousand-gallon storage tanks. We don't need rules on those. All we need is a simple, concise ruling that well pads and wells, as asserted by the commission, no more, are not projects. And we think we're entitled to that ruling. If we get that ruling, the injury my client has suffered has been redressed because of the moratorium that operates. We then go to the department and we apply. The department, under disagreement with the commission, gives them notice of the application. If the commission then says, hey, we want well pads leading through your buckets are projects, you have to come see us. That's a new claim. That's a contravention that's simply not before this court at this time. I'm still struggling with your assertion that it's not before the court when the very argument you're making is, what is the meaning of project? And it sounds like you're saying it's unambiguous that the meaning of project is such that it's not something that can be regulated by the commission, that it's clear that project means just the well pad, that is, just the drilling facility, and not the whole thing that would have to be associated with a fracking enterprise. This ambiguity, this problem, goes to the last clause of the definition of project. And there's a textual solution for this, but I continue to assert the court may not reach it, because amongst other things, ultimately, the activity being evaluated must be considered as a separate entity for purposes of evaluation. The parties have to agree what those words mean. What that lame ambiguity may or may not mean, because we don't need to. Because the commission has a certain all or nothing proposition, and we are addressing that all or nothing proposition. If and when they assert that a bucket or a storage tank or a frack truck or a weather conveyor or a pipeline or something else is a project, we will address that. But those are hypotheticals. That hasn't yet occurred. The only reason they're saying it's a hypothetical, we sort of thought it was pleaded in your complaint, that you were going to do. What we were going to do is plead it in the complaint with enough specificity to describe it basically. There are millions of details embedded in that, and this court cannot possibly take this definition of project and apply it to bucket by bucket. That is an impossible outcome. We don't need to do that. Because the commission hasn't asserted that. The only reason they assert it categorically, without more detail, without more information, well has and well is a project, we need relief from that assertion of jurisdiction. And then if and when they assert buckets or tanks or something else, when will we deal with it? We don't have to deal with that today. You still maintain that the compact applies only to allocation of water resources? I maintain that the language is purposive. We can focus on the further conservation utilization and so on, but yes. In fact, the commission said that. We go back to 1964 in the Federal Register, March 20, 1964, page 365. They say it. They come right out and say that. The compact has other things other than allocation. I'm sorry? The compact includes other matters other than allocation contamination. Oh, absolutely it does, but at this time we're only focused on project review jurisdiction. You're going to hear from the interviewers about all the authority the commission has. It's entirely irrelevant. If and when they assert authority, which they threaten to do by their proposal, we'll deal with that. But the only thing we have to deal with today is the assertion that pads and wells are projects. That's it. We don't have to parse it. Judge Harkin is exactly right. We will need to store water. We will need to manage it somehow, maybe tanks, maybe a pipeline, and maybe an apartment. But those are possibilities that are just not before this court, and we don't need to get into that to get the relief that we need. Granted, we saw broader relief in the complaint than we may yet. I understand it. People do that all the time. But what we need at a minimum is a declaration that they went too far. Because until we get that, we're stuck. We can't go to the department. We can't do anything. Until someone said, wait a minute, well pads and wells, categorically, without detail, they didn't look at all this detail. They didn't qualify. Everything is a project. We just think that's wrong. Judge Harkin, do you have any other questions for Mr. Overstreet? Not at this time. All right. Thank you. All right. You reserved time for rebuttal, Mr. Overstreet. Mr. Overstreet, did you reserve time for rebuttal? Yes, I did. I meant to reserve five minutes for rebuttal. I'm sorry. I didn't make that as an opening remark, but I made it to the collected data section. Was it on the clock? No. Well, we might have it back for a minute or two anyway. All right. Thank you very much. All right. Thanks. Mr. Haverstick. Good morning, Your Honors. May it please the Court. My name is Matt Haverstick. I represent President Pro Tem of the Pennsylvania Senate Joe Sconati, Senators Yaw, Baker, Cabello, and the other state legislators, and I would agree and again assert that the concern of the project, indeed the prospective rulemaking that we hear may be coming, is violative of Pennsylvania's sovereignty. It's in contravention to what the General Assembly, I believe, understands it has delegated to the commission indeed what it has the authority to delegate. What's your position on the storage tanks for those projects? Just the tank, not the well cap? I would accept the arguments made by counsel that at this time we haven't really taken a position on parsing out what we're concerned with the broad definition of a project as portrayed by the commission, and that we believe certainly impacts the sovereignty of the Commonwealth. That's all I have today, Your Honors. All right. Thank you, Mr. Haverstick. Thank you. Mr. Warren. May it please the Court, Kenneth Warren, Thor, the Delaware River Basin Commission, and with me at counsel's table is John Crewe. We argued in our brief that the action was premature because CRBC hasn't had no opportunity to review the details of WLMG's plans. While I won't focus on the prematurity argument today, I think we've heard that the details are still very much up in the air according to the account, and that the proper result would be to send the action back to the commission to find out the details and create a record. Well, there is a record. Isn't there a record of literally years and years and years of a moratorium? There is a record of a moratorium, and the moratorium is stretching over many, many years, right? It has stretched. Well, the moratorium is a de facto moratorium with the opportunity to seek a jurisdictional determination from the commission. Well, the opportunity to seek a jurisdictional hearing, as I read the record, including the document, it looked like this jurisdictional determination point, that this was something that the commission came up sort of by the feet of its pants. Yeah, you could send me something in writing or an email or something. I mean, how is that any kind of administrative remedy that people are supposed to know they have to exhaust? People have sought jurisdictional determinations from the commission for years, not in this context, right? With respect to this moratorium, there were no statements, no regulations, no procedures, so that when questioned about it, the representative of the commission had to say, yeah, well, they got to do something. Send me an email or something. I mean, in what administrative context has there ever been somebody who said, yeah, that's our regulation. Send me an email or something. In the December 8th, 2010 order, which was issued based upon the recommendation of the hearing officer, who at the time was Chief Judge Kahn, the commission said that it had not made a determination with respect to jurisdiction and that it would do so through the rulemaking but if the rulemaking were extended in the interim, any party could apply to the commission, preserve their jurisdictional arguments, and the commission at that point would either decide jurisdiction or if it wouldn't decide jurisdiction, the commission agreed that people could at that point come to court and say the commission hadn't acted. And the court found, or at least according to your opponents, the district court found as a matter of fact that this dispute was right because the DRVC had, in effect, taken a blanket position. Is that correct? The district court concluded that the DRVC had taken a position, but I believe the district court erred because that conclusion went directly contrary to the December 8th, 2010 order. All right. Well, let's assume we were, for purposes of discussion, we thought the district court got it right and not wrong and that we were at the merits point stage, okay? When we were last together, we were trying to find out the limits of your argument and you had been arguing that, well, a well can have any kind of fracking well, it's going to use water and, therefore, the commission could properly assert jurisdiction. The hypothetical put to you was about land use in different, well, we picked New York City, you know, what about Manhattan? Several skyscrapers, they all use a lot of water. And could you assert jurisdiction over land use in Manhattan? And you said, of course not. So, I believe our last question to you was, why not? What's the difference? If the difference is, if the only criteria for the DRBC to exercise jurisdiction is it uses water, why can't you just freely roam across the entire Delaware River Basin at any place anybody is using water, say, where we can regulate and forbid? Your Honor, I'm sorry, I'm going to need to answer this sitting down. Okay. Please do. The definition of project is based upon the policy of Section 320 of the Compact, which is to protect the comprehensive plan. And the comprehensive plan is not impaired by non-consumptive uses, which pose no threat of pollution. That's why the DRBC would not review non-consumptive uses. So, once you say that, and you say, imposes no threat of pollution, you're kind of importing Article V into your answer, right? It imports Article V, but it also imports the second part of the definition, which is that there's no substantial effect on water resources. Well, certainly, I mean, in your earlier argument when we were here a couple weeks ago, you noted that it will take millions of gallons to run one of these wells, but it will take millions of gallons to support a skyscraper. So, to say that the consumptive use is substantial in the one and not in the other aspect, I'm just struggling with that because it seems to me, I'm sure we could go and find public record information that would tell us how much a 20,000 person office building, for example, would take in the way of water consumption, but it would be a lot. Do you need a break, Mr. Warren? That would be helpful. Okay, we will. We'll take five, all right? I'm sorry, guys. It's my fault.  It's okay. Take a dive, take a dive, take a dive. I'm all right. Do you feel better? Do you want a drink? Do you want to take a risk? Give me a couple of minutes. It's fine right now. Yeah. That's such a weird reaction. It's all right. It's all right. You're great. So, we'll come back in. We'll finish that. Somewhat. I'm sorry. It's all right. It's all right. I'm great. Yeah. Drink more? I'll use this. Yeah. No, I mean. So, yeah. Thank you. Thank you. Yeah. It's all right. Thank you.   Drink more? Yeah. It's all right. It's all right. Drink more? It's all right. I'm picking it all up if he speaks from the... You should get a microphone. What's that? You should get a microphone. You can get a microphone. It's good. I wonder what that is. I'll put it away. No. This is not funny. Shut up. Testing, one, two, three, four. Testing, one, two, three. Just kind of hold it like this. It might actually block it from actually getting into the microphone. I'll leave that on. It is on. Thank you. So you can just click it. You don't need to switch it. Thank you. That would be great. Listen to it. Listen to it. It's a tape recorder. I think I'll just keep it. Sorry if I have a microphone. Sorry. Okay. Okay. Good. That's good. Okay. That was great. Thank you. Thank you. Okay. Thank you. We're back on the record and I think we've got a mic from Mr. Warren. Is that on? I believe so, sir. Okay. Good. Can you hear him, Judge Hardman? All right. I can. Thank you. And we were just at the point where I believe I was asking whether the way you had framed your answer did not import Article V into it. That is, it appears the concern that the commission has is not with consumption. It's with pollution. Is that a fair reading of your answer? No, sir. The commission has a water quantity and a water quality interest. So, with respect to water quantity, the interest is in the consumptive use, the loss in the well situation of 4.3 million gallons each time that well is fractured. And with respect to the water- When you say each time it's fractured, it's not 4.3 million times each time they use the well. That's consumption over an extended period of time, right? No, sir. It's every time they use the well. Every time they use the well. Each well, every time they fracture the well, will use 4.3 million gallons of water. They can put 10 to 12 wells on a well pad, and they can fracture them more than once. We're talking, in total, well over 100 million gallons of water. Okay. Taking that as a given, I put the question to you again, how is that- Why is that consumption different than the large-scale use that would be generated by two or three skyscrapers in rural Manhattan? This idea that there's a lot of use, you know, you don't claim- And I'm just picking on Manhattan because it's easy. I don't mean anything against New York City. But imagine a large housing development, you know, in suburban New Jersey or Pennsylvania, taking up a lot of water. I don't see the commission going in and saying, hey, you can't make that housing development. It's going to take a lot of water. So why is that even part of this? Why are we not focused on what appears to be the concern, which is you're going to wreck aquifers and pollute the system? Your Honor, because both are concerns, and in the skyscraper example or in the housing development example, most of the water gets returned to the system through wastewater treatment. With respect to these wells, much of the water stays in the ground, and the water that comes back up as wastewater is too contaminated to send to a publicly owned treatment facility and put back into the stream. All right. So I think I remember reading someplace 30 to 60% recovery, but maybe I've got that wrong about the water that they say they're going to be able to reuse. So they seem to think there's some substantial part. But let's move past the consumption part and ask whether or not we're not dealing here with a situation like Tarant where the Supreme Court was very specific in saying we should not assume that sovereign states are going to give up their power unless it's pretty explicit that they're giving up their power. We've got Miki here who made a forceful argument that nobody thought they were giving up the state to make regulation over oil and gas and natural resources. So why don't you speak, if you would, to that concern and specifically to the Supreme Court's treatment of it in Tarant. The Supreme Court in Tarant was dealing with a case in which the parties to the compact were taking different positions. And so when you have a dispute about members to the compact, the Tarant court said that it's much like a contract because you can't favor one party over another without looking to what the intent of the document is. Here we have the contracting parties to the compact regulating someone who is not a party to the contract. Okay, but we're still dealing with a contract, right? We're also dealing with a federal statute and a state statute. But we're told to view it as a contract and to interpret it using contract principles, right? Isn't that direct language from Tarant? In the context of Tarant, that's correct. But if you look at what this court did post-Tarant in the New York Shipping Association case, which is cited in our brief, and it was a matter of interpretation of a contract, this and will be interpreted under normal statutory provisions. And in that New York shipping case, the court used Chevron. Are you saying that this is somehow a morphing thing? If it's one of the states making the argument, then we apply contract principles. But if it's anybody else, it's not a contract anymore. It's like quantum physics. It's a particle or a wave, depending on who's observing it. As the court in Tarant acknowledged, a compact is both a contract and a statute. Right. And in Tarant, the situation was a dispute among compact members. Well, I understood. Somebody different is making the argument. So your position is, if I understand it right, it has to be treated as a statute if somebody else is challenging it. That's not a contract. Principles no longer apply. That's correct, Your Honor. And I believe that's the import of the New York Shipping Association case. There was no discussion by this court of contract in that case. All right. Even if that's true, the underlying question about whether the state gave up its sovereignty is still an issue to be addressed, is it not? Yes, sir. It's still an issue to be addressed. Okay. So why don't you address that? Was the state of Pennsylvania just grossly misguided when it thought it had the authority to establish a comprehensive plan for oil and gas usage in the state of Pennsylvania? Were they misguided in thinking that was their realm to operate in? They have the full right to operate in that realm. Each state is welcome to regulate natural gas as long as it does it consistently with whatever regulations or adjudications come out of the commission. Because the commission's power trumps the sovereignty of the state when it comes to oil and gas natural resource use. That's the position of the commission. Not at all. We are not a natural gas regulatory entity. We are now, right? Because you've said nobody can do anything until you're ready to say something about it. That sounds pretty much like regulating. What we're looking at at this point is regulations that address water use, Your Honor. Our jurisdiction is that it forbids them to do any natural gas extraction. That's the position the commission has taken. The commission hasn't decided yet whether that's what it's going to do or not. We have regulations that we're going to be putting in place. There's a moratorium in place, so they've decided that much, right? There's a de facto moratorium that they can come to us for a jurisdictional determination if they believe that we have no jurisdiction. Okay. What do the draft regulations look like, Mr. Ward? And on that, when are we going to see them? You know, we are going to see them at the end of November. That was what the resolution was that was adopted by the commission. And the draft regulations will ban the use of water, at least, for natural gas, hydraulic fracturing in the basin, because that's what we've been instructed to do by the commissioners. But these are draft regulations that will be open for notice and comment. And I can't tell you where all this ends up. I can only tell you that's what will be proposed. I think, Your Honor, that it's important that the executive director and her determinations are necessarily part of what the appellant claims is a moratorium. Look at the full range of activities involved with hydraulic fracturing, from the withdrawal of water to the storage of water to the use of water for hydraulic fracturing to the capture of wastewater to the eventual treatment and discharge of the wastewater. So this isn't a case where the commission has stepped in and said, somehow we're looking only at hydraulic fracturing in the narrow sense of injecting water down a well and we're ignoring all of the other activities that go with hydraulic fracturing. They were all part of the executive director's determination. Does that mean you're taking the position that it's impossible to look at the well pad separately from storage facilities? Just the opposite, Your Honor. I think that one could look at each activity separately. My point was... Okay. If that's true, then is Mr. Overstreet right that we don't even have to think about or worry about the storage facility part of it? We can look specifically and solely at the commission's assertion that you cannot build a well pad, you just can't do that because the commission says that's off limits. Absolutely not, Your Honor, because what we're dealing with is a set of activities as alleged in the complaint that the appellant intends to perform on this well pad site. Well, stick with me for a second. They're taking the position, and I grant you it feels a little bit like Wayne Land and Mineral has moved a little bit on its position, but here's what I'm hearing at the podium today. I'm hearing at the podium today, please take it as a given that our legal position is and our request for relief is solely a declaration that the commission cannot forbid or regulate the construction of well pads. Well pads, that's it. No other ancillary thing. Just imagine a well pad. They can't stop that. And they're asserting that they can't stop that. So my question to you, I guess, is are they correct that that's what you're asserting? Is the commission's position leave aside storage tanks, leave aside all that? We, the commission, can say no well pads, period. We've got the authority to stop that. If a well pad were being put up, in and of itself, someone were just putting up a well pad, the commission would have very little interest in it. The commission is not trying to stop people from constructing a structure on a piece of land because people do that all the time. We don't regulate structures that people put up on a piece of land. What's integral to this activity is the use of tanks and wastewater management and wastewater discharges. That's the reason for our interest. And when someone says well pad, well, it's a related use of land, as that definition of water resources applies. And so we can certainly look at it, but there's no reason to look at a well pad in isolation. We're a water management agency. They're bringing 4.3 million gallons of water onto the well pad. They're storing it there. They're then injecting it into the ground through aquifers. If they try to put a pipe through a reservoir, I believe Your Honor would say they're using that water resource to put the pipe through a reservoir, and we need to protect the reservoir. In this case, the pipe is going through aquifers into the ground, and the DRBC's regulations say that we will review penetration of aquifers because of the potential effect on water resources. So we're not just, you know, in this case dealing with a well. Does that mean you are not relying on Article V here when you're talking about the quality of the water resource? Judge Sirica, I need to distinguish the project review function under Section 3.8 from the regulatory function under Article V. And are we too early for that regulatory function, or is that at play here? We're too early for that regulatory function because all we have is the contemplation by the end of this month of proposed rules. And the appellate in its brief has stated that it is not challenging in this litigation the ability of DRBC to issue regulations. And the regulations do not use the word project. We have regulatory authority under Article V to prevent current pollution and future pollution with no restriction that it be a project. So we're going to be looking from a water management point of view, not from an overall point of view on whether there's water pollution that might occur here. For example, we're not an air pollution agency. These wells create air pollution, not our jurisdiction. But if they create water pollution, we need to deal with it because if 15 million people are drinking water from this basin and we simply sit back and allow very large quantity of water use that has the potential for pollution to destroy the aquifers and the drinking water, people will look at us and say you didn't do your job. The public is... And their assertion is that for purposes of this suit, they are not disputing that you've got authority under Article V to regulate pollution. I understand that, and you acknowledge that. Correct. So the suit we've got to deal with, or the question we have to deal with, we use the Article V issue to decide, supposedly. Can that be done? Can we do that? Yes. I think that you can separate the authority under Section 3.8 from the authority under Article V. All right. Then doing that, would you respond to the argument they make on page 3 of their reply brief, which is that the Commission doesn't have authority to regulate something if it wouldn't have the authority to construct and operate it on its own? Do you recall the argument that they made there? Yes, sir. I recall that argument, and it is absolutely incorrect. The purpose of Section 3.8 is to avoid impairment of the comprehensive plan because once we jump through the jurisdictional hoops in Section 3.8, that we have a project and that it has a substantial effect on water resources, we then have the merits question, if I can call it that, under Section 3.8. Does it impair or conflict with the comprehensive plan? The comprehensive plan is a set of uses. Among those uses are drinking water, recreational uses, using water, industrial uses, et cetera. So the question then becomes under Section 3.8, what activities may impair the comprehensive plan? Well, Bill, the question they are trying to put before us, I take it, which I'm hoping you're going to grapple with, is that you have historically done nothing like this. Their assertion is, and I take it that that's part of what this argument on page 3 is, is that historically, and you know the sections of the brief where they give their brief history of the Commission, et cetera, and they say, you know, in their language, in their approach, they speak about things that you think of as water projects, dams, reservoirs, pipelines, things like that. They've never before come forward, particularly when somebody's fought on it, and tried to do something like this. That's the claim. Leave it aside the landfill example, which is in the briefs and which we've read about. Why would you respond to that historical argument that this is something unlike anything the Commission has tried to do before? It is not something new for us. Let me give you some examples. Early on in the early 1960s, shortly after the Commission was formed, there were oil pipelines that were designed to go across stream crossings, and the Commission said, we're going to stop that activity from occurring until there are proper precautions set in place to protect the streams that the pipelines are crossing. Right, and I took them to have the position on that, that yeah, exactly, that that's crossing the stream. I guess your answer to that is fracking by definition, cracks in aquifers are like streams. It's all the same. It's all water. Is that right? That's correct. It's all water that needs to be used in accordance with the purposes of a comprehensive plan. So what we're looking at from a Section 3.8 standpoint is that if we take a pipe, in this case a fracking pipe, in that case an oil transmission pipe, we also have some natural gas pipes, and they present a potential injury to the comprehensive plan, that is a use of water resources that needs to be reviewed by the Commission. All right. Doesn't that take the purposive element out, Mr. Warren, because undoubtedly those millions of gallons that are injected into the ground is a use of water, and I took the district judge's opinion in your briefing to some extent to require only the involvement of water. That word involved appears in the district court's opinion, but the language of 3.8 is purposive. It's for the use of water. I think an argument can be constructed that a storage tank is constructed to a fracking well is for the storage and utilization of water, but I think it's harder to make the argument that the injection of water into the shale is for the use of water. The use of water is entirely incidental in that way, in a manner that's quite the opposite of what you would see in a hydroelectric dam, where the water is precisely for the generation of electricity. You can't generate the electricity without the water. Judge Hardiman, the Commission agrees that there is some requirement that the use of water be deliberate, so we are dealing with some type of purposive element here in interpreting for. What we disagree is what the appellant has tried to do, which is to add the word exclusive before the word for, because the purpose can be to extract natural gas, but there can also be a purpose to use a particular means to extract natural gas. Now, in certain circumstances, the use of the means may be the only available way to do it, and I think as a practical matter, that's what we have here, because if one looks where natural gas fracturing is occurring in Pennsylvania, in each instance that the Commission is aware of, the choice was to use water. We think that that choice is necessary to do it, and if you look at the complaint, that's what the appellant says they're going to do. How does that not do precisely what Judge Hardiman said and read the purposive element out of it? You are making the involved argument. You're saying it involves water. To say, of course, they have the purpose of using water doesn't seem to address the question which is in front of you, which is the compact language that you used the word for means it's for, it is not, the very object of it is the water. In this case, the object of it is not the water, as has been described in your opponent's brief and the question to you. So how is your response to that not just saying, yeah, yeah, we know, but if it involves water, that's enough for us? Because I think that there needs to be some type of deliberate element to it. Let me use this as an example. Well, nobody's going to say that the water is being used by accident, right? So you're saying it's involved. A furniture factory uses sandpaper, right? But you wouldn't say the furniture factory is a facility for the utilization of sandpaper, would you? You might say that they used sandpaper on purpose, if they made the deliberate choice to use sandpaper, because the use of a choice of a means can be purposive as well as the choice of the ultimate ends. Because in the case, for example, of Baxton against Kentucky, where the prosecutor wanted to convict a defendant, the choice of means was to use, purposely, a racial preemptory challenge to have an all-white jury. The ultimate... And skyscrapers and housing developments don't intentionally use water? They do intentionally use water, but they have no substantial effect on the water resources of the basin, because they are non-consumptive uses that don't cause pollution. Oh, they've got to be consumptive uses, counsel. Of course there's some that goes back in, but the water gets used, right? It gets used and then put back into the system. DRBC estimates that approximately 90% of the water from skyscrapers or the water from housing developments go back into the water management system through wastewater discharge. That's a great thing, but it doesn't ultimately answer the question that there's 10% that isn't coming back, and so if you expand the hypothetical construction enough, you're going to have a consumptive use, and yet you will never, I would take it, assert that we're going to regulate land use in Manhattan. You just know that's a bridge too far, so to speak, even though it's consuming enormous quantities of water. So how can it possibly be just consumption? It's got to be something more going on here than consumption, or the commission really would be going out there and saying stop the development. We're going to look at this. Look at an electric generating facility that uses water to cool the facility. DRBC doesn't regulate the electric generating facility. We regulate the activity that involves the use of water, and the reason that we regulate it is because that water is consumptively used. Other industries that also use water don't use them consumptively, and we don't regulate those in other industries. So we care about the overall effects on water quantity, which are huge here, given that we can talk about over 100 million gallons for this one well pad and think about how many additional well pads there might be in the basin. This is a huge water quantity problem for us, and we're charged with managing it to make sure that the use of water for this purpose doesn't detract from the availability of water for other purposes that are set forth in the comprehensive plan. But I don't for a minute diminish the pollution aspect of it too. The commission for many years has regulated the potential polluting uses of water, and in this case, given the brines and radioactive materials and metals that are going to be brought back up to this site, we have a real water management problem on our hands if this activity goes forward with this quantity of water. I have, if my colleagues will permit me, one final question for you, which is to speak to the Tahoe Compact. That's another thing that the opposing council has raised, and the Tarrant Court talked about how other compacts manage these things. The point is argued that the other compacts, just like this compact, don't address associated land use in a specific way, but the Tahoe Compact does, and the very fact that it does indicates that, by negative implication, the DRBC, the Delaware River Basin Compact, doesn't give you the jurisdiction to address that. I know I didn't do a very good job with that, but I think I'm trying to highlight for you the argument I understand that you're making, and I would like to hear your response to that. How do you respond to that? Your Honor, I think all you need to do is to take a look at the definition of water resources, because that definition specifically references related uses of land. So there was a contemplation back at the time the compact was formed to have the DRBC look at land use to the extent that it relates to use of water. And what I'm trying to get you to address is they say, no, no, that kind of general language doesn't do it, and, in fact, the government accounting office looked at all these, they compared them all, and they said, oh, the Tahoe Compact actually does that. These others don't do it. They just don't do it. And they have the Delaware River Basin Commission piece in front of them, compact in front of them, when they made that assessment. So that's what I'm trying to get you to address. Well, in addition to looking at the definition of water resources, you can look to other articles of the compact, and some of those articles deal specifically with watershed management, soil conservation, essentially land uses. And so the commission, in fulfilling its water management function, necessarily has to take a look at land. We're not a zoning agency, but, for example, we have floodplain regulations. We have specific authority under the compact to regulate in floodplains, and we say that certain structures cannot be located in the floodway. Other structures, if they're located in the floodplain, need to satisfy certain criteria so we don't get into a situation such as we've seen recently in Houston where flooding destroys lots of property. So that was a specific land use authority that was given to the commission. But we don't purport to supersede normal land use authorities of municipalities to the extent that they don't conflict with what the commission does. So land use zoning in floodplains occurs through state and local municipalities as well as through the commission. All right. Thanks very much, Mr. Warren. Mr. Yeager? Thank you, Mayor. Please support Jordan Yeager from Carnegie on behalf of the Delaware Riverkeeper Network and my name also is the Delaware Riverkeeper. There are a few areas where the position that we take differs slightly from the position of the commission, and I'd like to highlight where that is. But there is substantial overlap, and that relates to the first instance. Am I correct that you did not take a position on dismissal in the district court? We filed a brief on the dismissal motions at the district court and we argued that the dismissal motions similarly to what we were saying here, which is that the issue that was presented by a plaintiff unruly narrowed what was implicated and what needed to be considered by the court. Was the district court incorrect in saying in a footnote in its opinion that the R.N. took no position on whether the suit should be dismissed? We did take a position on the jurisdictional grounds that were being asserted by the commission. We did take a position on the definition of project, which was implicit in those issues. And so the court necessarily had to reach this question about how to interpret the contract in ruling on those jurisdictional issues. We didn't take a position on the jurisdictional issues, but we did take a position on those interpreted issues, and those we find, obviously, before the court again. And in that, we understand that the plaintiff, the appellate here, wants to look purely at 3.8 and wants to create a construct that makes this case simply about the definition of project. And what we're saying is, in order to address that definition of project, you need to read the compact in pageantry, or you need to read it as a whole, and it needs to be informed by what's in the rest of the compact. And that's why, to address Erika's question earlier, we do think you have to look at Article V, because Article V is part of the compact, and in order to understand what's in 3.8 and what's in the definitions in Section 81 in 1.G, it needs to be read in light of the purposes of the compact. So you really do take a separate position from the commission here, because I thought I understood Mr. Warren to say you didn't have to. You could treat 3.8 separately and not look at 5, and you're saying, I just can't be done. It's impossible. We have trouble understanding how one can treat 3.8 in a vacuum without understanding the broader purposes of the compact. To say, if one takes the appellant's position here, what the court would be left with is a ruling that says that an activity that could have a substantial impact on the water resources of the basin, the commission would have no jurisdiction over it. Because that's the setup. Because when you look at the concessions that Wayne Miller Group made in the context of the motions below, it said he was willing to concede that there would be a substantial impact. It is unfathomable to us to suggest that there could be a ruling by the court, that you could have a project, that you could have an activity, that would have a substantial impact on the water resources of the basin and not come within the jurisdiction of the commission. I'm sure we'll hear from Mr. Overstreet on that. We'll give him a little time, since we've given a lot of extra time to the commission. I'm sorry, but since you won't have a chance to get up and respond, why don't you assume for the sake of argument that they say something like this. We never said that they wouldn't have authority to regulate under Article V. In fact, we concede they'd have authority to regulate under Article V, and we don't intend to talk about their authority under Article V. But you can talk about their authority under 3.8 without talking about Article V, because 3.8 is all about whether or not they've got power, in the absence of any kind of pollution, to assert jurisdiction. That's kind of what I think their point is. Why would that be wrong? Well, we think that the power to regulate implicates the power to review, and particularly when one looks at the definition, and one looks at 3.8 and one looks at the definitions, there is specific reference to what is identified by the commission. And I think to the extent that the court is looking, and I think we can look at 3.8 and the definitions in Section 1, and resolve this as well. But what we're saying is, if you're going to concede that the commission has the authority to regulate, then that would be meaningless if the commission couldn't say, you need to come before us for review. Ultimately, and this gets to the question about the scope of land development activity or water withdrawal activity, ultimately, if it doesn't have a substantial effect on the water resources, then it's going to be approved, it's going to be allowed. But we can't read the definition, we can't read the word utilization out of 3.8. And I think when the court looks closely at a brief that a panel submitted, they do it quite explicitly. They repeatedly refer to only the sections of that, only those sections that say management and development. But it's not just about management and development of water. If it was just about management and development of water, I think the argument would be much stronger, but the word utilization is there as well. And I think that's ultimately what the district court was really focused on, was the word utilization. And so I think that I understand the purposeful, the question about the purposefulness of the word for, but it is purposeful utilization, not just management and development control. All right. Thank you. Judge Harmon, do you have any questions? No. All right. Mr. Overstreet, we did give substantial additional time to the commission, so we didn't reserve any time. Why don't we put three minutes on the clock and let you have a shot. Thank you very much, Your Honor. And I'll go backwards quickly and start with the suggestion that we had conceded that the commission would have authority under Article V to regulate well pads. We said you can assume the window for purposes of this debate that they do because we think it's irrelevant. We haven't conceded for a minute that we'll fight that fight if and when it comes. Because you've heard commissions say today they're going to try to ban it under Article V. That would be another case another day. I think, Your Honor, you drew attention to page three of our brief and the argument there about the use of project throughout the compact and the argument that we made that if the commission can't undertake the activity itself, it's not a project. But what we're really saying is once you arrive at the definition of the word project, it has to work throughout the entire compact every time the word is used. And we see the commission has the authority to take property by human domain for projects. They can sell taxes and bonds for projects. They can do all these things for projects. And what the point we're making is that if the definition doesn't fit across the entire document, it can't work. And so what is their definition? You know, what's fascinating is in order to have near-duty, you need to have at least two reasonable interpretations, objectively reasonable interpretations. I don't think we've heard a reasonable interpretation from the commission yet. Your position in the supplemental matter is that a project is anything that intentionally utilizes water. I would assume that using the teachings of the Baldwin case, looking at the elements of the contract as a matter of law, that interpretation is impermissible. Why don't you address, if you would, the assertion that we're not really dealing with contract interpretation principles here because you're not a party to this contract. As far as you're concerned, this is just a statute. Chevron kicks in. You've got nothing to say about it. There are several answers to that. First of all, if you peel back the compact cases and you look behind Tarrant, you look behind Texas meeting in New Mexico, both of those, Oklahoma versus New Mexico, and you get back to Dwyer and the case out of this area involving the Delaware Bridge Authority, that was an individual suit against the Delaware, the authority in that case. So to suggest that the Supreme Court has made this distinction between cases that involve just the states and cases that involve third parties is wrong. We know that from the Alabama case because the authority was in the Alabama case when Justice Rehnquist dealt with this problem. And so it's just simply wrong. But, again, I suggest it doesn't matter because whether we're talking about step one under Chevron, is there ambiguity in the statute? Or step one in contract analysis, is the contract ambiguous as a matter of law? The principles are generally the same. There's a pretty big difference because if it's Chevron and there's ambiguity, then they get to call the shot, right? And if it's contracts and there's ambiguity, then there's some fact-finding and decision-making to be done by a court. Isn't that a pretty dramatic difference? That is a difference if you conclude there's an ambiguity. But our point is that if you take the first step and you apply the teachings of Baldwin and you can compare that to the American Farm Bureau case, which was the Chevron step one case, this Courtland case, and extensive analysis of what do you look at in Chevron step one, and you look at the factors considered, they're generally the same. We think when you look at that record, which we presented to you, the only question we need to answer is are well patents and wells without more? That's their assertion. Projects. And if and when we have to come back about a slurge tank or a tunnel or a pipeline, if and when we meet that assertion, we'll address it then. But that case isn't before this Court. Thank you. Thank you very much. Appreciate counsel being here and for your arguments. We've got the matter under advisement, and we stand with Judge Harden.